UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| G. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04397-SEB-TAB |
| | ) | |
| P. TALBOT, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Gerald Buchanan, an Indiana Department of Correction ("IDOC") inmate filed this action pursuant to 42 U.S.C. § 1983. He alleges that he suffered severe pain in his thumb and that Dr. Talbot was deliberately indifferent to his serious medical need. Dkt. 8 at 2. Mr. Buchanan alleges that Dr. Talbot used less expensive treatment methods and that Wexford of Indiana, LLC ("Wexford") hired Dr. Talbot in an effort to cut costs and maximize profits. *Id.*

The defendants seek resolution of the claims through summary judgment. For the reasons explained below, the defendants' motion for summary judgment, dkt. [70], is **GRANTED**.

**I. Legal Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.

1

Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Montgomery v. Am. Airlines Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as

to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II. Material Facts

The following statement of facts has been evaluated pursuant to the standard set forth above. The facts are considered undisputed except where disputes of fact are noted.

### A. The Parties

At all times relevant to the allegations in his complaint, Mr. Buchanan was an IDOC inmate housed at Pendleton Correctional Facility ("PCF"). Dkt. 84-6, ¶ 2 (Buchanan Affidavit). In February 2019, he was unable to move his thumb, it was swollen, and he was in extreme pain. *Id.*, ¶ 3. During this time, he was under Dr. Talbot's care. *Id.*, ¶ 2.

Dr. Talbot worked for Wexford at PCF. Dkt. 88, ¶¶ 2-3 (Talbot Affidavit). Wexford was the medical provider for the IDOC.

### B. Mr. Buchanan's Medical Care[1]

Mr. Buchanan works at the prison doing utility work. Dkt. 72-4 at 15 (Buchanan Deposition). His job duties include maintenance, cleaning showers and the cellhouse, and getting ice. *Id.* at 15-16. Mr. Buchanan typically works every day, for 17 hours per day. *Id.*

In a psychotherapy appointment on January 14, 2019, the mental health provider's notes indicated that Mr. Buchanan discussed that he planned to stay at his current job, but he reported that he was struggling with pain in his hands. Dkt. 74 at 20. He reported he put in requests to medical but had not yet been seen, and he wore a hand wrap from another offender to his session.

---

[1] The Court notes that the extensive medical history in the record, filed under seal and in redacted form, spans 2013 to 2020, and is inclusive of medical issues and treatment unrelated to the facts of this case involving Mr. Buchanan's hand. Dkt. 73; dkt. 74; dkt. 76; dkt. 77. The Court includes only the relevant medical interactions from 2019 and 2020 in its summation of the material facts.

3

*Id.* On February 13, 2019, he still reported hand pain at his psychotherapy session. *Id* at 25.

Mr. Buchanan saw a nurse about a week later for pain in his right thumb, "with limited mobility and swelling." *Id.* at 27-29. The nurse noted that he had limited movement, there was "good color" to his thumb though it was slightly swollen, and his pain was not the result of a specific injury. *Id.* Mr. Buchanan was taking over the counter Tylenol and using capsaicin cream, but these did not provide relief. *Id.* The nurse assessed that Mr. Buchanan had a strain or sprain and referred him to a provider. *Id.*

### 1. Dr. Talbot's Treatment

Dr. Talbot saw Mr. Buchanan for the first time for his thumb on February 22, 2019. Dkt. 88, ¶ 10; dkt. 74 at 30-33. Mr. Buchanan reported that he had been experiencing pain for three months and had used aspirin he purchased from commissary, but it did not work. *Id.* Dr. Talbot noted that Mr. Buchanan's job required him to be physically active, and that he worked daily for extended periods of time. *Id.* After examining Mr. Buchanan and performing a Finkelstein test,[2] Dr. Talbot concluded that Mr. Buchanan likely had De Quervain's tenosynovitis, which is sometimes also referred to as tendinitis. The "exact cause of De Quervain's tenosynovitis is not known, but any kind of repetitive movement of the hand or wrist, such as lifting, can make it worse. It is associated with chronic overuse." Dkt. 88, ¶ 24. Because one accepted treatment is immobilization, Dr. Talbot placed a spica cast on Mr. Buchanan's hand, prescribed Tylenol, and planned to remove the cast in 30-45 days. *Id.*, ¶ 11; dkt. 74 at 30-33. He did so because the spica

---

[2] A Finkelstein test involves bending the thumb across the palm of the hand, bending the fingers down over the thumb, and bending the wrist toward the pinky finger. *See* https://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/diagnosis-treatment/drc-20371337 (last visited Sept. 22, 2021) ("If this causes pain on the thumb side of your wrist, you likely have de Quervain's tenosynovitis.").

cast is an accepted form of treatment, not because it was "cheaper" than other alternatives. Dkt. 88, ¶¶ 23, 25. Dr. Talbot explains that x-rays or further testing is generally not necessary to make such diagnosis, and the treatment regime includes pain medication, immobilization of the affected area, avoidance of repetitive movements, and ice—some serious cases need potential surgery. *Id.* ¶ 24.

Dr. Talbot saw Mr. Buchanan a second time on March 1, 2019, and Mr. Buchanan reported that the cast was loose. *Id.*, ¶ 12; dkt. 74 at 34-37. Dr. Talbot determined that the cast was not loose and counseled Mr. Buchanan not to get it wet. *Id.* Dr. Talbot gave orders for Mr. Buchanan not to lift anything except meal trays for the next two months. *Id.* Later that month at his psychotherapy session, Mr. Buchanan continued to report that he struggled with pain in his hand, numbness, and limited mobility. Dkt. 74 at 39.

Dr. Talbot removed the cast on April 8, 2019, noted that there were no new complaints, and counseled Mr. Buchanan on range of motion exercises for his thumb. Dkt. 88, ¶ 13, dkt. 74 at 41-43. Dr. Talbot believed the De Quervain's tenosynovitis improved, and Mr. Buchanan had movement with "minimal tenderness." *Id.* Mr. Buchanan testified that after the cast was removed, his condition was "basically the same," he had blisters around the finger areas from the cast, and he could open his hand "up a little" but could not grab or pick up anything. Dkt. 72-4 at 40-41. Mr. Buchanan also disputes that Dr. Talbot told him about exercises for his hand. *Id.* Mr. Buchanan stated that Dr. Talbot said that over time his hand would get better. *Id.* at 42.

About a week later Mr. Buchanan saw a nurse because his thumb had not improved. Dkt. 74 at 47-49. Mr. Buchanan reported that he still could not grip anything without dropping it, and the nurse noted that his right thumb was painful and swollen and there was bruising on his right

5

arm caused by the cast. *Id.* He was placed on a medical lay-in for two weeks until Dr. Talbot could see him, but he was not restricted from walking or going to recreation. *Id.*

Mr. Buchanan saw Dr. Talbot on April 19, 2019. Dkt. 88, ¶ 15; dkt. 74 at 50-53. Mr. Buchanan told Dr. Talbot that he had been squeezing a stress ball with his affected hand since the cast had been removed. *Id.* Dr. Talbot attested that this act further irritated the tendinitis, and he instructed Mr. Buchanan "to only flex and extend the right thumb joint and not to apply any restrictive force" and recommended workouts "with no resistance." *Id.* Dr. Talbot ordered an x-ray and prescribed Tylenol. *Id.* The x-ray showed no fracture. *Id.* In early May 2019, Mr. Buchanan was seen by a nurse and had a psychotherapy session, and he did not mention his thumb at either visit. Dkt. 74 at 56-62.

On May 23, 2019, Dr. Talbot examined Mr. Buchanan for the final time. Dkt. 88, ¶ 18; dkt. 74 at 63-68. Dr. Talbot noted that there was "tenderness over the right thumb dorsal ligaments," and he prescribed a Pamelor trial for "possible neuropathy." *Id.* Dr. Talbot also noted that Mr. Buchanan "had failed conservative measures for his right thumb," and he requested physical therapy. *Id.* ("OPR for onsite physical therapy"). Dr. Talbot does not know why Mr. Buchanan did not receive physical therapy after he requested it. Dkt. 88, ¶ 28. He does "not believe there is a policy or practice" of Wexford's to deny physical therapy if it is necessary, to reduce costs. *Id.*

Mr. Buchanan mentioned his thumb again at a psychotherapy session on September 23, 2019. Dkt. 74 at 69-78. The mental health provider's notes indicated that Mr. Buchanan mentioned that Pamelor had been prescribed by the doctor, that he was supposed to be seen by a physical therapist but had not been, and that he still had complaints about medical care for his hand. *Id.* Mr. Buchanan did not complain about his thumb again until June 2020, when he saw Dr. Knieser. *Id.* at 79-130.

### 2. Medical Care After Dr. Talbot

On June 11, 2020, Mr. Buchanan saw a nurse for pain in his wrist and hand. *Id.* at 131-33. Mr. Buchanan was given Tylenol for three days and referred to a provider. *Id.* Dr. Knieser saw him on June 22, 2020, and he ordered x-rays and noted there was weakness in the grip of his right hand and "slight atrophy of thenar eminence right thumb."[3] *Id.* Mr. Buchanan's x-rays were normal, and Dr. Knieser also diagnosed De Quervain's tenosynovitis. *Id.*; dkt. 72-4 at 58. Dr. Knieser recommended that Mr. Buchanan wear a brace that he now wears daily. Dkt. 72-4 at 60-61. Dr. Knieser advised Mr. Buchanan to rest and did not prescribe physical therapy. *Id.* at 64.

Mr. Buchanan testified that Dr. Knieser told him that an x-ray should have been taken before he was placed in a cast, but then stated that Dr. Knieser "didn't specifically say Dr. Talbot missed [steps]" in the treatment process. *Id.* at 74-75.

Mr. Buchanan continues to work but his ability is limited because he states he cannot hold or lift anything. *Id.* at 61. He states he was told by the technician after the most recent x-rays that he has bone deterioration or arthritis, and he testified there was not much else that could be done about his issue because he has arthritis in his wrist. *Id.* at 63.

### III. Discussion

At all times relevant to Mr. Buchanan's claims, he was a convicted inmate. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate

---

[3] *See* https://www.healthline.com/health/thenar-eminence-pain ("Your thenar eminence is the soft fleshy area at the base of your thumb. The four muscles found here make your thumb opposable . . . . You use your thumb to perform many of your daily tasks. Over time, these repetitive motions can stress the muscles that control your thumb, causing inflammation and pain.") (last visited Sept. 24, 2021).

7

two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Mr. Buchanan does not have a constitutional right to demand specific medications or treatment. *Arnett,* 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm."). Instead, "[a] medical professional is entitled to a deference in treatment decisions unless no minimally competent professional would have [recommended the same] under the circumstances." *Pyles*, 771 F.3d at 409. "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal citation omitted). When a plaintiff's claim focuses on a medical professional's treatment decision, 'the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)).

The defendants argue, but point to no authority, that though Mr. Buchanan had symptoms, "the tenosynovitis in this case did not reach the threshold of a 'serious medical need.'" Dkt. 71 at 11. However, the defendants argue that even if Mr. Buchanan's condition constitutes a serious medical need, the medical care provided was appropriate and did not constitute deliberate indifference. *Id.* The Court need not decide whether Mr. Buchanan's condition was a serious medical need, and instead assumes it was and proceeds to the second prong of the deliberate indifference analysis.

### A. Dr. Talbot

When Dr. Talbot first saw Mr. Buchanan, he examined him and determined that Mr. Buchanan had De Quervain's tenosynovitis. To treat it, Dr. Talbot immobilized his thumb with a cast. When Mr. Buchanan came back the following week, Dr. Talbot reassessed the fit of the cast to make sure it was appropriate. Dr. Talbot removed the cast without difficulty a little over a month later and believed the condition had improved advising Mr. Buchanan to give his recovery more time. When Mr. Buchanan still reported having trouble, Dr. Talbot ordered an x-ray, and ruled out a fracture. Dr. Talbot prescribed medicine for pain and potential neuropathy and ordered a medical lay-in during the course of treatment. When he determined that conservative methods failed, Dr. Talbot put in a referral for physical therapy. Beyond that last treatment date in May 2019, Dr. Talbot was no longer in charge of Mr. Buchanan's medical care. These facts show that Dr. Talbot considered Mr. Buchanan's complaints and addressed them within his medical judgment. Arguing that Dr. Talbot was deliberately indifferent to his need for treatment, Mr. Buchanan takes issue with particular decisions Dr. Talbot made.

#### 1. Initial Examination

First, Mr. Buchanan argues that Dr. Talbot did not complete a proper examination of his

hand because he did not conduct any tests despite what the medical records say; rather, Mr. Buchanan states that Dr. Talbot "merely touched" his hand and "decided on a diagnosis without evidence." Dkt. 84 at 1-2. But it is undisputed that Dr. Talbot saw Mr. Buchanan for a medical visit regarding his thumb on February 22, 2019, looked at and touched Mr. Buchanan's hand, and listened to Mr. Buchanan's reported symptoms. It is further undisputed that Mr. Buchanan communicated to Dr. Talbot that he had not suffered any injury to his thumb that could cause his pain, that his thumb was stiff and sore, that he couldn't grip or hold anything, and that he thought he might have tendinitis. Dkt. 72-4 at 31. And Dr. Talbot responded to his condition by personally placing Mr. Buchanan's hand in a cast the same day. *Id.* at 32. Dr. Talbot attested that Mr. Buchanan experienced pain when he flexed his right thumb but still had function of daily living activities and had been working. Dkt. 88, ¶ 10. Based on these factors, Dr. Talbot attested that it was his medical impression that Mr. Buchanan indeed had De Quervain's tenosynovitis, or tendinitis, and began a treatment plan accordingly. *Id.*, ¶ 11.

Simply put, Mr. Buchanan has designated no evidence that would allow a reasonable jury to conclude that Dr. Talbot disregarded his condition or failed to exercise his professional medical judgment.

### 2. Immediate X-ray or Referral to Specialist

Second, Mr. Buchanan argues that Dr. Talbot should have ordered an x-ray immediately to assess whether he had a fracture or further damage to his hand, rather than automatically putting him in a cast. Dkt. 84-6, ¶ 5. He contends placement in the cast was an inappropriate medical approach because he understood that a cast was used to set broken bones. Dkt. 72-4 at 71-72. But, Mr. Buchanan is not entitled to demand a specific course of treatment, such as imaging testing or a referral to an outside provider. *Arnett,* 658 F.3d at 754. Dr. Talbot explained that x-rays are

generally not necessary to assess De Quervain's tenosynovitis, and that immobilization with a cast is one accepted form of treatment. Mr. Buchanan has not produced evidence to the contrary. And, even if Mr. Buchanan's thumb was fractured, which later x-rays showed that it was not, he presented no evidence that the cast Dr. Talbot provided would not have been appropriate treatment. Mr. Buchanan also points to no evidence to indicate that referral to a specialist was needed.

Mr. Buchanan testified that Dr. Knieser told him that x-rays should have been taken first before implementation of a cast. But there is nothing in the medical record that supports such statement. The Court cannot deny summary judgment based on this inadmissible hearsay. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). Even in the light most favorable to Mr. Buchanan, assuming that this evidence was admissible, disagreement between medical professionals is not enough to establish an Eighth Amendment violation. *Pyles*, 771 F.3d at 409. And Mr. Buchanan testified that Dr. Knieser did not state that Dr. Talbot had missed any steps in treating him. Further, Dr. Knieser made the same diagnosis of De Quervain's tenosynovitis and did not order any further treatment or referral for physical therapy or to a specialist.

### 3. Further Harm

Third, to the extent that Mr. Buchanan argues that he suffered further harm from the cast because it caused some blistering and bruises, or simply, that the cast was ineffective in remedying his condition, these arguments fail. Mr. Buchanan is entitled to only adequate medical care, not the best care possible. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006); *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999). Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Johnson*, 433 F.3d at 1013. Additionally,

the Eighth Amendment does not require prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment or to administer the least painful treatment. *Snipes*, 95 F.3d at 592.

To the extent that Mr. Buchanan argues that the cast caused his continued thumb pain, he has produced no evidence to support this conclusion. In fact, the medical record indicates a significant gap from the time Dr. Talbot removed the cast in April 2019 and Mr. Buchanan's receipt of treatment for his thumb in June 2020 by Dr. Knieser. Dr. Talbot attested that the cause of De Quervain's tenosynovitis is attributed to repetitive movements of the hand or wrist in activities such as some of Mr. Buchanan's job duties of lifting, and it can reoccur if those movements are continued. Dkt. 88, ¶ 24, 30. There is no indication here that utilization of a cast – a method that Dr. Talbot testified is appropriate for tendinitis—caused Mr. Buchanan further and significant harm. The reoccurrence of Mr. Buchanan's symptoms, including continuing to experience some pain, does not establish deliberate indifference. *See Leiser v. Hoffman*, 2021 WL 3028147, *3 (7th Cir. July 19, 2021) (citing *Snipes*, 95 F.3d at 592)) ("[D]octors are not deliberately indifferent when they are unable to eliminate completely a patient's pain.").

### 4. Exercises and Physical Therapy

Fourth, Mr. Buchanan argues that Dr. Talbot did not educate him about his diagnosis or discuss any range of motion exercises with him, which left him to "guess" as to how to remedy his situation. Dkt. 84 at 6. Dr. Talbot attested, and the medical record supports, that he did provide such education. But even accepting Mr. Buchanan's version of the facts as true, as required by the summary judgment standard, any failure by Dr. Talbot to provide exercises did not amount to deliberate indifference, which requires "more than negligence and approaches intentional wrongdoing." *Arnett*, 658 F.3d at 751 (internal citation omitted). Medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference. *See Dunigan ex rel. Nyman*

*Winnebago Cty.*, 165 F.3d 587, 592 (7th Cir. 1999). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that it is so obvious that it should be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728. Whether or not Dr. Talbot educated Mr. Buchanan on exercises for his thumb when he removed the cast, he still provided ample care, including a cast and pain medicine. And it is undisputed that Dr. Talbot later steered Mr. Buchanan away from exercises that would aggravate his condition when he learned about them and instructed Mr. Buchanan to work on opening and closing his hand.

Regarding physical therapy, the record reflects that Dr. Talbot did *put in* a provider order for physical therapy for Mr. Buchanan when it was clear that he failed conservative treatments. There is no dispute that Mr. Buchanan did not actually receive the therapy. But there is no evidence that Dr. Talbot was aware that Mr. Buchanan did not receive it or participated in any denial of physical therapy. Dkt. 88, ¶ 28; dkt. 84-6 ¶ 8; dkt. 84 at 4 (Buchanan's statement that Dr. Michael Mitcheff, the Regional Medical Director, denied this request "because it would cost money."). Because there is no evidence that Dr. Talbot knew that Mr. Buchanan did not receive physical therapy, there is no evidence that Dr. Talbot ignored a risk to him in this regard.

In sum, when the Court considers deliberate indifference, it examines the totality of Dr. Talbot's medical care. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018). Dr. Talbot provided Mr. Buchanan ample care for his thumb, though it might not have been the care that Mr. Buchanan desired. No reasonable juror could conclude that Dr. Talbot was deliberately indifferent to Mr. Buchanan's medical condition. Accordingly, he is entitled to summary judgment.

### B. Wexford

Mr. Buchanan argues that the defendants "have an unwritten practice and policy to implement cost cutting measures versus providing adequate care." Dkt. 84 at 4. He provides nearly

identical affidavits from other prisoners, each stating that Dr. Talbot told them he "was here to save Wexford money and not provide" them the care they wanted. Dkt. 84-2; dkt. 84-3; dkt. 84-4; dkt. 84-5.

Because Wexford acted under color of state law by contracting to perform a government function—providing healthcare to inmates—it is treated as a government entity for purposes of Section 1983 claims. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379, 381 (7th Cir. 2017) (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 786 (7th Cir. 2014) and *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). As such, Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of respondeat superior for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional . . . policies or customs." *Simpson v. Brown Cty.*, 860 F.3d 1001, 1005-06 (7th Cir. 2017) (citing *Monell*, 436 U.S. at 690-91)). To prove a deliberate indifference claim against Wexford, Mr. Buchanan must establish (1) that he suffered a constitutional deprivation, and (2) that the deprivation was the result of an express policy or custom of Wexford, or due to its failure to promulgate a necessary policy. *Glisson*, 849 F.3d at 379, 381.

It is well established that where there is no evidence of any constitutional violation, any claim based on an unconstitutional policy necessarily fails. *First Midwest Bank Guardian of LaPorta v. City of Chi.*, 988 F.3d 978, 987 (7th Cir. 2021) (stating that a plaintiff "must establish that he suffered a deprivation of a federal right before [private entity] fault, deliberate indifference, and causation come into play"). *Houskins v. Sheahan*, 549 F.3d 480, 493-94 (7th Cir. 2008) (collecting cases). Here, Mr. Buchanan cannot establish that a constitutional violation occurred, and therefore, no such Wexford policy caused a constitutional injury.

Even assuming that Mr. Buchanan has pointed to an unconstitutional policy, for example, that his physical therapy was not approved in order for Wexford to save costs, he has not shown that such unconstitutional policy caused him a constitutional injury. As the Court discussed previously, there is no evidence in the record that establishes that Mr. Buchanan's condition required physical therapy. Even further, there is no evidence to support that Dr. Talbot was a gatekeeper of such policy, or that it was Dr. Talbot who blocked Mr. Buchanan from any receipt of physical therapy—when the record indicates it was indeed Dr. Talbot who put in an order for Mr. Buchanan to receive physical therapy.

Accordingly, no reasonable juror could conclude that Wexford maintained an unconstitutional policy that caused Mr. Buchanan to suffer a constitutional injury. Accordingly, summary judgment is granted in Wexford's favor.

### IV. Conclusion

For these reasons, the defendants' motion for summary judgment, dkt. [70], is **GRANTED.**

Because none of the arguments Mr. Buchanan raises in his surreply would change the outcome of the Court's ruling, the defendants' motion to strike the surreply, dkt. [90], is **DENIED as unnecessary**.

Final Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date:   9/29/2021

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

G. BUCHANAN
873224
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Heather Terese Gilbert
CASSIDAY SCHADE LLP
hgilbert@cassiday.com

Emily Kathleen VanTyle
CASSIDAY SCHADE LLP
evantyle@cassiday.com

Marilyn A. Young
CASSIDAY SCHADE LLP
myoung@cassiday.com